IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JAMES E. ORLOFSKE**<br>2427 E. Mall Drive, #133<br>Ft. Myers, Florida 33901<br><br>*Plaintiff*<br><br>v.<br><br>**UNITED STATES OF AMERICA**<br><br>Serve:   Channing D. Phillips<br>U.S. Attorney for the<br>District of Columbia<br>555 4th Street, NW<br>Washington, DC 20530<br><br>and<br><br>Attorney General of the<br>United States<br>Department of Justice<br>Room 5111<br>10th & Constitution<br>Avenues, NW<br>Washington, D.C. 20530<br><br>Defendant. | Case No.:   1:17-CV-00295 |

## **COMPLAINT**

*(Federal Tort Claims Act; Medical Malpractice)*

The Plaintiff, James E. Orlofske, by his attorneys, Ryan S. Perlin, Emily C. Malarkey, and Bekman, Marder & Adkins, L.L.C. brings this action against the United States of America and claims damages arising from injuries sustained by Mr. Orlofske

1

while at patient at the Washington, D.C. Veterans Affairs Medical Center, and states as follows:

## Jurisdiction and Venue

1. This is a civil action to recover damages and is brought pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671 through 2680.

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1346(b)(1).

3. Venue is appropriate in this jurisdiction pursuant to 28 U.S.C. § 1402(b), which provides that an FTCA claim "may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred." The negligent acts and omissions at issue in this case occurred at the Washington, D.C. Veterans Affairs Medical Center in Washington, D.C.

## The Parties

1. The Plaintiff, James E. Orlofske, is a citizen of the United States and a resident of Florida who resides at the address set forth in the caption.

2. The Defendant is the United States of America, a Sovereign nation that has consented to be sued for negligent acts and omissions made by its employees, agents, and servants within the course and scope of their employment with the Defendant pursuant to the FTCA.

3. At all times set forth in this Complaint, the Defendant, United States of America, through the U.S. Department of Veterans Affairs, owned, managed, and operated the Washington D.C. Veterans Affairs Hospital (hereafter, the "VA"), which was a medical facility offering medical and other related services to the general public.

In such capacity, the Defendant, its hospital, and its agents, servants and/or employees, medical and administrative staff, and consultants held themselves out as practicing ordinary standards of medical, surgical, hospital, nursing, emergency, and pathologic care and, as such, owed a duty to the Plaintiff to render and provide health care within the ordinary standards of medical, hospital, and cardiologic care, and to exercise reasonable skill and care in the selection of its personnel to provide competent physicians and other medical and administrative personnel, possessing that degree of skill and knowledge which is ordinarily possessed by those who devote special study and attention to the practices of interventional cardiology, and to supervise and provide Plaintiff with diagnostic and medical services and treatment commensurate with the condition from which the patient suffered and for which patient entered said hospital.

4. At all times hereinafter set forth, all physicians, nurses, and/or other individuals staffing the VA, including, but not limited to, Vasilios Papademetriou, M.D., Tendoh Timoh, M.D., and Louis Hooper, CVT, were agents and/or apparent agents, servants, or employees of the Defendant, United States of America and were, at all times, acting within the scope of their employment or agency.

### Statute of Limitations and Exhaustion of Administrative Claims

5. The medical malpractice giving rise to this claim occurred on or around February 5, 2013.

6. Mr. Orlofkse timely filed a claim with the Department of Veteran's Affairs within two years after the claim accrued pursuant to 28 U.S.C. § § 2401(b).

7. More than six months have passed since the claim was filed with the

appropriate agency, yet the agency has not made a final disposition of the claim. Mr. Orlofske, therefore, deems the claim denied pursuant to 28 U.S.C. § 2675(a). Having now exhausted Mr. Orlofske's administrative remedy, this claim is timely and properly filed.

8.  Pursuant to the D.C. Medical Malpractice Act of 2006, the Defendants were notified of Plaintiff's intention to file suit against them greater than 90 days prior to the filing of this action.

## Statement of Facts

9.  The Plaintiff, James Orlofske, was a combat medic for three years during the Vietnam War.

10. In 2012, Mr. Orlofske was diagnosed with symptomatic coronary artery disease (CAD). After a positive stress test, he was referred for a cardiac catheterization procedure which showed blockages including an ulcerative 95 percent lesion of the left anterior descending (LAD) artery, a 95 percent lesion of the right coronary artery (RCA), and a total 100 percent blockage of the smaller obtuse marginal branch.

11. On March 20, 2012, Mr. Orlofske underwent three-vessel coronary artery bypass grafting (CABG procedure), which temporarily resolved his symptoms.

12. In November 2012, Mr. Orlofske began experiencing exertional chest pain which progressively worsened.

13. On or about December 10, 2012, Mr. Orlofske underwent a cardiac stress test with nuclear perfusion imaging. The exercise portion of the stress test was negative for ischemia. Nuclear perfusion imaging, though, revealed moderate reversible ischemia

in the mid and basal segments of the lateral wall suggestive of heart disease in the area of the left circumflex artery.

14. On January 22, 2013, Mr. Orlofske's VA health care providers saw and examined him in the cardiology clinic. They determined that Mr. Orlofske should undergo cardiac catheterization, with outpatient follow-up approximately one month later.

15. Mr. Orlofske presented to the VA Hospital on February 5, 2013 for the recommended elective cardiac catheterization procedure.

16. Upon arrival, VA health care providers began administering anesthesia medication. After those medications had begun sedating Mr. Orlofske and affecting his cognition, health care providers presented him with a 17-page documented titled "VA Research Consent Form." The form purported to obtain Mr. Orlofske's consent for involvement in an experimental study known as the DIVA Stent Trials.

17. Prior to being presented with this paperwork in his sedated state on the morning of surgery, no health care provider from the VA had ever discussed the DIVA Stent Trials with Mr. Orlofske, nor had anyone from the VA asked him whether he wanted to participate in those trials, or would consent to participating in them.

18. Although Mr. Orlofske signed the Consent Form for the DIVA Stent Trials, at the time he did so, he was under the influence of medication that impaired his ability to make decisions. The trials were not adequately explained to him, he did not understand what they were, and he did not understand the material risks or benefits of his inclusion.

19. In addition to the fact that Mr. Orlofske did not give his proper informed

5

consent for the DIVA Stent Trials, Mr. Orlofske was not a proper candidate for them. In fact, his inclusion violated at least two multiple inclusion criteria, such that it was a violation of the standard of care for Mr. Orlofske to be included as a Study participant.

20. First, the vessel being stented for Mr. Orlofske was too small to meet the criteria for his inclusion in the Study. Second, inclusion in the Study required intent to use a distal embolic protection device. Under the circumstances of Mr. Orlofske's cardiac catheterization, it would have been impossible to use a distal embolic protection device because of the size of Mr. Orlofske's vessels, so the health care providers could not have had the required intent.

21. The elective cardiac catheterization proceeded on February 5, 2013 under the direction of Vasilios Papademetriou, M.D., Tendoh Timoh, M.D., and Louis Hooper, CVT (hereafter collectively the "catheterization health care providers").

22. The first portion of the catheterization procedure involved diagnosis of the patency of Mr. Orlofske's native coronary arteries and bypass grafts. The catheterization revealed that Mr. Orlofske's three-vessel disease, which had been repaired during the previous year's CABG procedure, remained patent and well vascularized.

23. The only new blockage that appeared since the CABG procedure was a 90 percent stenosis at the anastomosis of the previously placed saphenous vein graft to the very small first obtuse marginal artery.

24. The location of the lesion was in a small branch vessel that was unlikely to be causing the area of ischemia seen on nuclear imaging. This branch vessel did not require interventional treatment and proceeding with interventional treatment of balloon

angioplasty and placement of a stent in a branch vessel as small as this, was a violation of the standard of care.

25. In violation of the standard of care, the catheterization health care providers elected to perform percutaneous transluminal coronary angioplasty on the lesion. That procedure involved placement of a balloon catheter within the vessel and inflating the balloon in an attempt to compress the blockage against the artery wall and widen the passage.

26. During this process, the catheterization health care providers utilized a 2.5 mm balloon, which was too large for the vessel within which it was being used. Use of a balloon that is too large for the vessel is a violation of the standard of care and puts the patient at risk of suffering an artery dissection and/or perforation.

27. After improperly using a balloon in this vessel, the catheterization health care providers elected to proceed with placement of a DIVA stent in the vessel. This area still did not require interventional treatment and placing a stent within it was a violation of the standard of care. In addition, the stent that was used was too large for the vessel in which it was placed. Use of a stent that is too large for the vessel is also a violation of the standard of care, and placed the patient at risk of suffering arterial dissection and/or perforation.

28. Shortly after the stent was placed and expanded, the vessel in which the stent was placed dissected and ruptured, as should have been expected by the health care providers.

29. The vessel rupture had catastrophic consequences, resulting in rapid

buildup of fluid in the sac surrounding Mr. Oflorske's heart, the pericardium, and compression of the heart. This condition, known as cardiac tamponade, caused Mr. Orlofske to develop severe chest pain, caused his blood pressure to drop rapidly, and caused him to go into hemorrhagic and cardiogenic shock.

30. Mr. Orlofske went into cardiopulmonary arrest and a Code Blue was called as his condition precipitously worsened.

31. He had no blood pressure for approximately two minutes as specialists in thoracic surgery were emergently called into the operating room as the catheterization health care providers attempted to remove fluid from the pericardial space, a process known as pericardiocentesis.

32. Attempts at pericardiocentesis were unsuccessful, so Mr. Orlofske was intubated and anesthetized and an emergency lateral thoracotomy (surgical opening of the chest) was performed.

33. Once the chest was opened, Mr. Orlofske's thoracic surgeon was able to isolate the ruptured vessel and suture the dissected vessel to control bleeding. He was transferred to the intensive care unit for further evaluation and treatment.

34. While in the ICU, Mr. Orlofske quickly decompensated again, becoming hypotensive and tachycardic. He went into cardiac arrest with pulseless electrical activity (continuation of electrical activity in the heart not accompanied by a palpable pulse). Another Code Blue was called. He remained intubated and sedated and required on-and-off cardiopulmonary resuscitation for more than an hour, as well as multiple transfusions of packed red blood cells (12 units), fresh frozen plasma (6 units), and platelets (10

units). A bedside echocardiogram revealed a global decrease in left ventricular heart function, so an intra-aortic balloon pump to mechanically pump Mr. Orlofske's heart was placed. Mr. Orlofske required intravenous pressor medication to raise his blood pressure and 100 percent oxygen.

35. During this period of profound hemorrhagic shock, Mr. Orlofske's heart showed evidence of global left ventricular dysfunction, resulting in a heart attack known as a STEMI (ST-segment elevation myocardial infarction) as a direct result of the coronary dissection and rupture.

36. Blood gases measured during this time period indicated severe lactic acidosis, indicative of hypoxia (deficiency in the amount of oxygen reaching the tissues and major organs).

37. As of the following day, Mr. Orlofske was noted to be following simple commands, but he was not able to move his lower extremities, and there was concern for long-term neurological deficit as a result of the significant period of ischemia he had endured the preceding day. He was also found to have shock liver and there was growing concern that he had experienced another heart attack.

38. As his recovery progressed, it was discovered that Mr. Orlofske was completely paralyzed with numbness from the area of the nipples down. This condition, which has not improved, occurred as a result of a large thoracic spinal cord infarct, which in turn occurred directly as a result of the coronary artery rupture, cardiac tamponade, cardiac arrest, hypotension, tachycardia, thoracotomy, and extensive resuscitation efforts, all brought about because of the negligence of the catheterization health care providers.

39. As a result of Mr. Orlfoske's paraplegia, he was found to be incontinent of both bowel and bladder, which continues to the present.

40. Mr. Orlofske was also subsequently found to have pulmonary emboli in both lungs, which required treatment with Coumadin, a blood thinning medication.

41. While undergoing treatment at the Richmond VA, Mr. Orlofske developed a bowel rupture requiring hemicolectomy (surgical removal of portion of the colon). He has also experienced numerous pressure ulcers.

## Count 1: Medical Negligence

42. All allegations set forth in the preceding paragraphs are adopted and incorporated by reference in this Count.

43. The Defendant, the United States of America, individually and through its employees, servants, and agents, actual and apparent, at the Washington D.C. Veterans Affairs Hospital, including, but not limited to, Vasilios Papademetriou, M.D., Tendoh Timoh, M.D., and Louis Hooper, CVT, owed Mr. Orlofske the duty of care of professional health care providers with the degree and skill that comparatively reasonable, competent medical providers in the same or under similar circumstances would have provided.

44. The Defendant, the United States of America, individually and through its employees, servants, and agents, actual and apparent, at the Washington D.C. Veterans Affairs Hospital, including, but not limited to, Vasilios Papademetriou, M.D., Tendoh Timoh, M.D., and Louis Hooper, CVT, breached the standard of care in the treatment of Mr. Orlofske and were negligent in that they, *inter alia*:

10

    a. Improperly included Mr. Orlofske in an experimental study for which he did not qualify;

    b. Performed interventional treatment on a coronary vessel for which it was not indicated;

    c. Performed percutaneous transluminal coronary angioplasty on a vessel for which it was contraindicated;

    d. Utilized a catheter balloon that was too large for the vessel within which it was placed;

    e. Performed stent placement in a coronary vessel for which it was not indicated;

    f. Placed a stent in a vessel for which stent placement was contraindicated;

    g. Utilized a stent that was too large for the vessel within which it was placed;

    h. Failed to properly perform the cardiac catheterization procedure;

    i. Caused Mr. Orlofske's coronary vessel to dissect and rupture;

    j. Were otherwise negligent, to be determined and supplemented in the course of discovery.

45. As a direct and proximate result of the negligence of the United States of America, acting by and through its agents, servants, employees, and apparent agents, Mr. Orlofske was caused to suffer painful and permanent injuries and impairment to his body, was caused to sustain severe mental anguish and emotional pain and suffering, was caused to incur hospital expenses, medical expenses, and was caused to incur other financial losses.

46. As a direct and proximate result of the negligence of the United States of America, acting by and through its agents, servants, employees, and apparent agents, Mr. Orlofske is now completely paralyzed with sensory loss below the nipple line, is incontinent of bowel and bladder, and has experienced and will continue to experience lifelong changes in his level of activity and enjoyment of life.

47. As a further direct result of the negligence of the United States of America, acting by and through its agents, servants, employees, and apparent agents, Mr. Orlofske will require in the future additional hospital and medical care, will be unable to engage in any normal activities, employments and pursuits, will sustain a total loss of earnings and earning capacity, and will otherwise suffer pain, personal injury and both economic and noneconomic damages.

48. Each of the medical personnel who attended to Mr. Orlofske during the cardiac catheterization procedure on February 5, 2013 were employed by the United States of America, through the U.S. Department of Veterans Affairs and the Washington D.C. Veterans Affairs Hospital, and were acting within the scope of their employment at the time of the negligence.

WHEREFORE, for all the reasons set forth herein, the Plaintiff, James E. Orlofske, respectfully requests that the Court:

A. Enter judgment against the Defendants in the amount of $20,000,000;

B. Award costs expended in pursuit of this claim;

C. Grant any other relief that the Court deems just and proper

### Count 2: Lack of Informed Consent

49. All allegations set forth in the preceding paragraphs are adopted and incorporated by reference in this Count.

50. The Defendant, acting by and through its agents, servants, employees, and apparent agents, failed to obtain Mr. Orlofske's informed consent to be involved in the experimental DIVA study by, *inter alia*, failing to disclose all material risks and benefits of participation in the study, failing to disclose that his medical condition met multiple exclusion criteria, failing to disclose that inclusion in the study is contraindicated in patients with his medical condition, failing to discuss the material risks and benefits of his inclusion in the study while the patient was in a state where he was capable of understanding and appreciating the risks and benefits, failing to notify the patient of the material risks and benefits of proceeding with angioplasty and stent placement in a vessel that was unlikely to be causing ischemia and which was too small for such treatment, and in otherwise failing to notify Mr. Orlofske of all material risks, benefits, and alternatives to proceeding with interventional cardiologic treatment.

51. If appropriately informed, a reasonable person in Mr. Orlofske's circumstances would have refused inclusion in the experimental study, would have elected not to undergo balloon angioplasty, and would have elected not to undergo stenting.

52. As a direct and proximate result of the negligence of the United States of America and the failure to obtain Mr. Orlofske's informed consent, Mr. Orlofske was caused to suffer painful and permanent injuries and impairment to his body, was caused to

13

sustain severe mental anguish and emotional pain and suffering, was caused to incur hospital expenses, medical expenses, and was caused to incur other financial losses.

53. As a direct and proximate result of the negligence of the United States of America and the failure to obtain Mr. Orlofske's informed consent, Mr. Orlofske is now completely paralyzed with sensory loss below the nipple line, is incontinent of bowel and bladder, and has experienced and will continue to experience lifelong changes in his level of activity and enjoyment of life.

54. As a further direct result of the negligence of the United States of America and the failure to obtain Mr. Orlofske's informed consent, Mr. Orlofske will require in the future additional hospital and medical care, will be unable to engage in any normal activities, employments and pursuits, will sustain a total loss of earnings and earning capacity, and will otherwise suffer pain, personal injury and both economic and noneconomic damages.

55. Each of the medical personnel who purported to obtain Mr. Orlofske's informed consent on February 5, 2013 and before were employed by the United States of America, through the U.S. Department of Veterans Affairs and the Washington D.C. Veterans Affairs Hospital, and were acting within the scope of their employment at the time of the negligence.

WHEREFORE, for all the reasons set forth herein, the Plaintiff, James E. Orlofske, respectfully requests that the Court:

D. Enter judgment against the Defendants in the amount of $20,000,000;

E. Award costs expended in pursuit of this claim;

F. Grant any other relief that the Court deems just and proper

/s/ Ryan Perlin
Ryan S. Perlin (Bar No. 992065)
perlin@bmalawfirm.com
Emily C. Malarkey (Bar No. 9971187)
malarkey@bmalawfirm.com
BEKMAN, MARDER & ADKINS, LLC
300 West Pratt Street, Suite 450
Baltimore, Maryland 21201
410-539-6633

***Attorneys for Plaintiffs***